Good morning, Your Honors. May it please the Court, my name is Jessica Carmichael. I represent Kaixiang Zhu, a Chinese immigrant who came to this country in 2001 and who was swept up in the immigration sting operation that is the subject of this case. The only issue in this case, Your Honors, was the issue of mens rea. That is, that my client attempted to obtain a green card illegally with the knowledge that it was illegal. The withdrawal was not a... That's correct, Your Honor. That's correct. We, in fact, argued against the withdrawal instruction, but the Court gave it anyway. We did not argue withdrawal. The government, in its prosecution of this sting operation, arrested, debriefed, prosecuted, held, and then deported a witness who had material exculpatory information that went directly to the heart of my client's defense. Would you have the government just hold him forever? Your client was not in custody, hadn't been arrested. They didn't know when, if ever, he was going to be detained. What would you have them do? That's an excellent question, Your Honor. There are a number of remedies that could have ameliorated this situation. I suggested them to the district court, and the district court provided absolutely no remedy. But what I would say, Your Honor, is three things to that. First of all, we are not asking that someone be held indefinitely. The government makes these types of decisions all of the time when it comes to prosecuting cases. And I mean, for example, in the case of confidential informants, when the government doesn't want to reveal the name of a confidential informant, the government has the choice whether to prosecute that case or not. So these are not decisions that the government doesn't regularly make. So number one, they could have chosen not to prosecute the case. But secondly, they could have asked permission of the court to release the witness. They could have asked for early appointment of counsel so that counsel could interview the witness. And certainly, Your Honor, and I think this is an important point in this case, they could have not continued to deny that this witness said the exculpatory statement that he did say. And I think that that's an important point. Wasn't that evidence brought, I mean, wasn't that evidence presented at trial, albeit indirectly through other witnesses? It was, Your Honor. And that was, that was admitted because it was an appropriate evidentiary ruling. But it wasn't admitted as a remedy for the constitutional violation in this case. Why does it matter? Because it was not an adequate remedy, Your Honor. When the basis of the government's case is knowledge, that my client knew all along that this was an illegal endeavor, it's important not just to have any individual testify that he was told it was illegal, but the person who did the convincing himself. Let's back up a moment. So is it clear that this doctor would have said that I told your client that this was illegal? That's an excellent question, Your Honor. And that was an important issue of contention in the party's briefs. The government has alleged that this doctor would have stated only that he told the aforementioned individuals that this was legal. However, Your Honor, it was clear from the statement that he didn't recall who my client was at that time, and the agent testified that he didn't have any information to suggest that my client was treated differently than these aforementioned individuals. And I'd further point out that the case law is very clear that a defendant doesn't have to make a specific showing of material exculpatory evidence, because that would be such a high burden when we don't have that witness, but just a plausible showing. So I don't think that it's a far assumption to make that he, in fact... Where's the line between plausibility and rank speculation? I believe that this falls squarely within plausible material exculpatory information. Isn't the test, in terms of the analysis on appeal, if there was an opportunity and, in fact, the evidence was presented indirectly through some other means, don't we look at that? We're required to consider that, right? Of course, Your Honor, and that should be considered. But throughout this case, the government continued to assert that my client knew all along that this endeavor was illegal. Did you find that surprising? I did not, Your Honor. What I did find surprising was that when there was a witness who could directly rebut this, the defense did not have access to that witness. It was this witness who provided the forms for my client to fill out, this witness who guided my client throughout this process, and it was this witness who told him that it was legal. So for the government to argue that he must have known all along it was illegal, and we have a witness who could testify that he told him it was actually legal, would be... You keep saying that he told him, but we don't have any direct evidence for that. We don't have direct evidence, Your Honor, but we have very clear circumstantial evidence in this case that that would be, that that would have been what he told my client specifically. Was there anything that would have kept you from getting your client's brother-in-law brought to court? He would not have been able to offer nearly the same evidence, Your Honor. The client's brother-in-law was another customer in this scheme, essentially someone else who was told it was legal. That statement that he was told it was legal would have been a self-serving statement of that witness, and he would not have been able to present to the jury the same way that the person who actually did the convincing, simply because there was someone else who was... And it wouldn't have had as much weight, but that wouldn't have, would there have been any problem with its admissibility? For the brother-in-law to get up and say, I was in the room, so was your client when the doctor told us this was all legal, or something like that. That's correct, Your Honor. It would have been admissible for the same reason that the agent's testimony about that statement was admissible. However, it's simply not an appropriate substitute for the testimony of the actual person who guided the client through this that no reasonable person could have ever thought that this was legal. It's important to have not just anyone, but the person himself who did the convincing. Well, I don't think there's any doubt it would have been stronger evidence, but still it would have been, if the brother-in-law had testified, it's some evidence. It's the best you can do. I agree. It would have potentially helped to have that evidence, and we did get it out through the agent, but again, the government continued to assert that he didn't even mean what he said when he said it. Even though we were able to elicit that statement from the agent, the government continued to assert that he didn't actually mean that. It was possibly mistranslated, it was taken out of context, and the defense was unable to offer that witness who said it to rebut that assertion. That goes directly into my second issue of error, Your Honors, and that is that the deportation of this witness was detrimental to allowing my client to fully present his defense, but the government suffered absolutely no adversity with respect to this witness that it deported when one of their main pieces of evidence in this case was an email that was purportedly sent from this witness. The government was able to construe all statements of this witness that it didn't like negatively and deny admission of those statements, but then construe statements that were favorable to its case in a way that helped its theory. They were allowed to introduce this email even though it was not properly authenticated, even at a prima facie level, and even though it contained an additional level of hearsay. This email from the witness was not properly authenticated for two reasons, Your Honors. First, the evidence showed that emails that were sent right before or at some time before the email in question very specifically said, I didn't send the last email. It was sent by Mr. Liu who was using my computer. I don't speak English, but I have relatives translate for me. So the mere fact that the email that was introduced was written in English and this person didn't speak English necessarily means that someone else drafted and sent that email. So that's the first reason, that it can't be what it was purported to be. But secondly, we now know then that this email was translated. And for translated evidence to be admissible, it has to be done by a competent translator whose qualifications are known. And in this case, we didn't know who the translator was. In fact, there were probably multiple translators over the course of these email exchanges. And so therefore, it was not properly authenticated because we couldn't assess the accuracy of the translation. Whose burden? I mean, so the government says that given the circumstances of this translation, there really is no cause to doubt its accuracy, or at least you didn't show that. Whose burden was it to show its accuracy? It was the defense burden to initially show that there was substantial doubt with respect to the translation. And I believe that was overcome and more. We have in black and white an email saying, I didn't send that last email. Someone else uses my computer. Someone else uses my email. And in fact, I don't even read or write English or speak English. Counselor, am I remembering right, did the government agent testify that after there was this thing about who's using the email, they changed the email name and password? They did, Your Honor. And they further suggested that the accuracy was clear because the facts, that only he and Dr. Hui, that's the deported witness, the undercover agent, Dr. Hui, used this email address and it contained facts that only they would have known. But I submit to Your Honor that the email that he said was previously sent by someone else also contained facts that only he and Dr. Hui would know. And furthermore, he can't actually assert that it is an email that Dr. Hui used because Dr. Hui didn't speak English and that email was sent in English. So someone else was clearly drafting that email. So for those two reasons, I submit that the substantial doubt about the translation issue was absolutely raised. I don't think that there would have been any more ways that this could have been raised when you have an email in black and white. So the court actually, we raised the hearsay issue because we didn't know who the translator was. And when a translator is, the case law is very clear on this point, that when a translator is not acting simply as a conduit for the language, then that statement becomes not the declarant statement, but the translator statement. So for example, if the translator is summarizing what the declarant would say and not just being a conduit for it, would be the translator statement. And the district court didn't actually address that objection at all. It only addressed the co-conspirator hearsay objection. So I would submit that that also should not have been admitted because it was the translator statement and not the declarants. This was not just an abuse of discretion in this case, but a fundamental issue of fairness. Again, the government was able to heavily rely on this email from this witness that it deported, construe that statement in the light most favorable to it. But the defense, when trying to present testimony that this witness provided favorable information to the defendant, continued to deny that he even said that, or that it meant that, and that it was out of context. And we were unable to rebut that assertion adequately. And finally, Your Honors, I would say that this is not harmless error because the government itself admitted that it went directly to the heart of the defense. They admitted that in the briefs. I didn't actually put this in my briefs, but I would like the court to take note that the jury deliberation spanned several hours and the jury did ask a question about intent. So it was clear that the jury was thinking about this issue. It was not harmless. And finally, Your Honors, with respect to the third issue I raised, it's the improper judicial interference issue. I don't have a lot to add other than what is in the papers. I would just like to note that at trial, I did object to the courts interfering with my witness. And there were two instances that I found particularly egregious, which was one, the court not allowing the translator to translate the answer of my witness. He said that it was discursive and non-responsive, but he didn't know Chinese. It just sounded that way. And secondly, that the court interrupted the closing argument three times, not just to, and for no reason that I can see, but not just telling counsel to move on, but actually telling the jury to disregard counsel's comments. If the court has nothing further. Without objection from the government. Without objection from the government, Your Honor. The government says, well, he interrupted us a bunch too. The tenor and tone of those interruptions were vastly different, Your Honor. Thank you. Thank you, Your Honors. Let's hear from the government. Good morning, Your Honors. May it please the court, Christopher Catazon for the United States. I apologize for the time and confusion. I've been, I was pulling double duty this morning, and I didn't check in when I came in. At a minimum, this court should affirm the district court's denial of Mr. Zhu's motion to dismiss the indictment for the deportation of this allegedly material witness. Because the district court's conclusion that Mr. Zhu has failed to establish that Mr. Hui's speculative testimony would have been material, favorable, and non-cumulative is correct. The government would urge that the court go a step further, and in addition to affirming, also clarify that in the Fourth Circuit, when evaluating a material, alleged deportation of an allegedly material witness, the defendant must show good, bad faith by the government before the defendant can succeed on a wrongful deportation claim. Say that again. I didn't hear you. Your voice dropped. I'm sorry. In addition, I think the key question, the narrow question before the court is to affirm the district court's conclusion that Mr. Zhu has failed to establish materiality, favorability, and lack of cumulativeness with Mr. Hui's testimony. But as every other court of appeals who have considered the deportation of an allegedly material witness has held, in order to establish that there was a violation of the Due Process Clause or the Sixth Amendment's Confrontation Clause, a defendant has got to establish both bad faith and prejudice. In order to get any kind of remedy or just to avoid the dismissal? In order to get any kind of remedy. And that's because, as the Supreme Court held in Vernal, I'll mispronounce it, Vernal-Berzeda, the government has a dual responsibility when it comes to immigration matters. And as Your Honors have already noted this morning, in a case like this, where a defendant is on the lam for more than a year and then later seeks to admit or raises a wrongful deportation claim, it's not possible for the government to hold someone for a year or more without violating that person's rights. And a good faith test would allow the courts to evaluate the government's actions without, while taking into account both the government's responsibilities in enforcing the law and carrying out its other duties of recognizing the rights of this allegedly wrongfully deported material witness who would otherwise be languishing when he or she could be sent back to their home country. On materiality and favorability, Judge Diaz, I think your point here is that even granting everything that Ms. Carmichael has said about the one line about what Mr. Hui said to the four individuals that was in the report, there's no evidence that that was, that similar information was conveyed by Dr. Hui to Mr. Zhu. There's no evidence beyond speculation that Dr. Hui was communicating that information to all of his clients. But all you need, right, is a, I mean, given the posture that we can't actually talk to the material witness, I mean, hasn't the court said that all you need is sort of a reasonable inference, a plausible inference? And isn't the most sensible inference that this is how he sells his services to his customer base? Why would he tell some people it's legal and then tell other people this is illegal, but you should do it anyway? I don't think that's the most sensible inference in the context of the full report, which is Dr. Hui makes quite clear in the report that he understood that what he, the process was illegal, but that the cards were legal. There's no suggestion that Dr. Hui was telling all of his client in the, in the full report that he was telling all of his clients, trying to mislead them to bring them to telling them that he was, they're going to government office. Why would he tell only these four that this is legal, but tell everybody else something different? Do we have any reason to treat part of his customer base or pitch it one way to some customers and one way to others? No. And I, I, I think a possible reason is that, uh, in, in the light of this long, this long report that, uh, Mr. Wee or Dr. Wee in a moment misspoke was misunderstood. We were sort of living in a world where hypothetically you are actually accepting your colleagues position that this is right. Uh, you know, in a hypothetical world, uh, it would, um, be strange that he would just say it to four people, uh, in a hypothetical world where he did say it. Uh, I think he could be trying to, if you read it very narrowly, uh, he advised that Andrew's way of obtaining the green cards was legal, which very narrowly written is accurate and that they were legal green cards. Uh, they were obtained through back channels, but it wasn't like they were created on a fake. Sure. But that's a different, again, I really don't want to waste too much time on this, but that's sort of a different argument as to, I'm simply saying, if we're going to assume for a moment, he said this and that what it is, is somewhat favorable, at least cast doubt on what these people were told. Is there any reason to, I mean, I just, you're more familiar with the record than I am. Is there anything to suggest these four customers were special? He on all those assumptions? No, there's no reason to think that these four had something separate from the others. That's okay. I'd point out as well that these four customers include, uh, uh, Mr. Lou, uh, Mr. Zoo's brother-in-law, uh, whom, uh, Mr. Zoo in this case, uh, made no apparent, uh, attempt to, who was actually just down the street. Uh, one, Mr. Zoo's trial was ongoing, uh, and who could have testified presumably, uh, whether Dr. Wheat, uh, did indeed say that, uh, could have testified what his brother-in-law's, uh, intent and understanding was, uh, at the time before the, before the indictment came down, could have testified that in the two years that he spent with his brother-in-law, Mr. Zoo, he was warned. Ah, and I initially thought that was legal, but then when I got to that hotel room, I changed my mind. You should be careful before you pay $60,000 and, and get a, get this fake green card, or, uh, get this green card through this illegal process. Uh, I'm not saying that, I don't know whether or not any of that existed, but, uh, without Mr. Lou even being, uh, uh, asked to stay, uh, I don't, I'm strong. You should have objected the first time he tried to say that. I'm sorry? On the grounds, it was, if he, if the brother-in-law came in and was put on the stand by a defendant and started trying to quote what the defendant had told him or the explanation the defendant gave, you'd have been objecting first word out of his mouth. Uh, I would, I would point out. Appropriately. Well, the district judge did note that, uh, he would potentially, potentially this could come in as present, uh, intention, uh, statements of present and future intent. Uh, and without, uh, uh, foreshadowing whether or not the district judge would have, uh, admitted this evidence, the court did say, uh, had Mr. Lou been here and had he tried to offer testimony of Dr. Hui and, and Mr. Zhu, uh, it very well may have come in. So I certainly agree we would have raised any objections that we would have had, but I Uh, on the question of, uh, the translated email, uh, I disagree with, uh, Ms. Carmichael's initial starting off point, uh, which is that the baseline rule is that a translator, uh, is a mere conduit. Uh, and in this court, uh, in this case, the district court did not find accurately, uh, that there was sufficient reason, sufficient indicia to step away from that baseline rule. What is your theory of admissibility of this document? I'm sorry? What is your theory of the admissibility of this document? Uh, it's a statement in furtherance of the conspiracy. Uh, here you have, uh, Dr. Hui, uh, saying to, uh, the, uh, agent, uh, these are the individuals, uh, whom, uh, are still interested in a green card. And one would presume that, uh, the, uh, uh, broker, uh, would know what his clients were interested in, uh, or if his clients, uh, uh, uh, were not interested in the, in still obtaining the cards, that the broker, uh, would be, not be sending that email. But the problem is that it's not really Dr. Hui, it's somebody drafting the email on his behalf if we accept the premise that he could neither write nor speak English. That's correct. Uh, but I, I, I accept that premise, of course. Uh, I would disagree, though, that there's any further indicia to think that someone, uh, has nefarious objectives in translating this, uh, email. And in the case, the two cases from this court about, uh, uh, translations, Vidasek, uh, and Shibin. In Vidasek, the court noted, uh, that, again, the baseline rule is a translation is a mere conduit. Uh, but in that case, it, it adopted this four-part test when there were indicia, uh, sufficient indicia, indicia of lack of reliability. In that case, the court was dealing with a confession, uh, where the, uh, uh, documents and witnesses and testimony, in that case, it was from Bos, the Bosnian War, and there was a contention that the documents had even been created three years, and the dates didn't line up for the documents, that they were falsified or somehow planted, uh, uh, uh, in the war site that was later found. And then a later other piece of evidence, a confession that came in, uh, the, the court said, before we're going to allow the government to, uh, admit this translated confession, let's make sure that the government's translator, uh, satisfies these indicia of reliability. Well, so it's not a confession, but it really does strike at the very heart of the defense in this case. I mean, uh, even the government pointed out that this was a critical piece of evidence for budding this notion that the defendant did not understand that what he was doing was illegal. It seems to me that in that circumstance, there, maybe if, if the rules don't indicate that there should be some concern on the part, part of the trial court to make sure that what this document is reported to be is actually what it is. And, and I would say that when the, the point of the confession is, is not necessarily that it's a critical piece of evidence, but that there are, there's reason to think, uh, or at least reason for the court to make sure that the person doing the translating, uh, is doing it fairly, especially if it's a government translator. That's why we have, uh, uh, court interpreters are sworn beforehand, uh, for the same reason you don't want to, the, the, what the appearance of a government translator, uh, who could be filtering, uh, in favor of the government was coming. In this case, that's not present. Uh, there's no allegation that, uh, whoever was translating for Dr. Hui had some nefarious, uh, motive, uh, was trying to misrepresent what he was saying. How do we know, even know that he or she was competent? Uh, we don't know who the, who that was. All right. That's the problem, right? So how do we know that what he or she purported to translate was in fact accurate? At least in this case, I would say, uh, if you look at the document itself, it's, uh, uh, a simple statement and a list of names. Uh, and, uh, this was not a, and as the agent testified, the document is consistent with their ongoing back and forth with Dr. Hui. So there are, uh, with his ongoing back and forth with Dr. Hui. So there are other relia, indicia of reliability around the document, uh, that, that would, uh, uh, put to rest concerns that it was not accurate. Uh, it would, uh, certainly the idea that it would say the opposite of what it was saying or that, uh, well, it doesn't need to say the opposite. There might just, might just have been a, a typographical error. It might've included a name that wasn't intended to be included. How do we, how do we know that? Uh, I think in, in this case, the, there's no indication that, uh, that type of error, error would have occurred. What about the fact, I'm sorry. No, I want you to keep going. What about the fact that, uh, uh, there was some indication that this was not exactly the most secure of email accounts? What are we to make of that? I think in, in context, again, uh, it makes it, it's not necessarily a matter of security. It seems like it's a man who doesn't speak perfect English, uh, who relies on other, doesn't speak English at all. I shouldn't say perfect, uh, relies on others around him to send, uh, messages, uh, uh, in English. So in that context, it's not like his email was hacked, uh, or that he was, uh, receiving, sending things, or other people were sending things that were contrary to what, uh, he was trying to communicate. I think that, uh, the idea, oh, the previous email was sent by so-and-so, uh, could be I was down the hall, uh, and, uh, providing this information, he sent it. Or I was sitting next to him, providing this information, he sent it. Not, uh, I was sitting at the computer and typing it. So again, I just don't think that that factor, uh, ramps up any lack of reliability in the way that you'd have, uh, with a confession, uh, or an instance where you have, uh, indicators that documents were falsified or, or backdated, or, uh, significant reasons that, uh, uh, to distrust the translator enough that we would... is the inability of the defendant to be able to cross-examine the preparer of this document with regard to the circumstances and reasons and basis for this listing of names. I mean, it would, for her defense, it would make a big difference whether this person is just typing, writing these names out from a list, or whether or not he, there's particular information he's got with regard to each individual. Why he's sending it? I mean, it, you used it very, it's very damning to the defendant because at a time when they're contending they've withdrawn or not involved or decided not to go forward, here's a list that indicates, could be read to indicate that this conspiracy is still ongoing and he's still very much involved, still very much interested, and they have a complete inability to cross-examine the preparer of this document. And when it comes to, uh, uh, Dr. Hui in the bill, I mean, to, to . . . And that's who I'm referring to. And I think to, to get to the court's concerns, and it may not fully address them, but the government had every expectation that had Dr. Hui, uh, uh, needed, uh, for, for the other defendants, the more than twenty defendants who pleaded guilty in this case, and, uh, Dr. Hui was present for many of their, uh, you know, the, as they're, uh, pleading guilty, deciding whether or not to go to trial. And the government expected that Dr. Hui would have testified against them. Uh, in, in other words, uh, it, it doesn't seem like he, the, there's, the government had no indication that Dr. Hui, uh, was, uh, misleading his clients, uh, and, uh, or, uh, providing false information to the clients, and the clients didn't have that information. As, uh, that indication, uh, as suggested by the fact that more than twenty pleaded guilty, uh, and, uh, didn't, none of them have raised this idea that . . . What does that have to do with this case, then? It, it's, I would say it's important background, uh, uh, and it gets also to Judge Harris's question earlier, which is, uh, is there, assuming that this, the statement in the, uh, that Dr. Hui said the process was legal, assuming that was made to those four, do we have any reason to think it was not made to the others? And, uh, well, one reason, one indication that it was not was that no one else has raised this idea that, uh, I was told that this was a, a legal process and then surprised at the end. And, uh, I know that's not evidence in the record, but it's a background fact, uh . . . I'm still not following that. I mean, this defendant is entitled to defend against the allegations, and, and you've deported the one witness who might have been able to suggest that he was told that it was that, that, that seems to make sense to me. But now, on top of that, you purport to introduce an email that, as Judge Traxler pointed out, uh, he's got no opportunity to examine the witness about. And some very, frankly, very flimsy circumstances. And, and all I was offering that was not to suggest that, uh, uh, Mr. Zhu, uh, doesn't stand every tub on his own bottom, but to try to get to Judge Traxler's point about, uh, uh, Mr. . . . Dr. Hui's gone. That's a defensible, uh, decision, uh, in the government's view, more than defensible. Uh, but, uh, in light of the fact that Dr. Hui's gone, what do we make of the, the email? And, uh, to me, it's, it's some telling information that none of the other defendants . . . Well, let's, let's say we disagree with you on that point. So, uh, you've made an argument about harmless error. Tell us a little bit more about that. Uh, the, the offense, uh, was complete. And, uh, uh, Ms. Carmichael's, uh, uh, argument that this was a key, pivotal document, I think oversells it. The offense was complete, uh, when Mr. Zhu walked into the room, uh, uh, uh, submitted his fingerprints and said, yes, uh, I want this green card. It was complete after he was told that it was an illegal process. It was complete after he knew it was a, uh, going into a hotel room, not a government office. It was complete after he knew that he'd be paying $40,000, $50,000, $60,000 for this green card. Uh, so the idea that this piece of evidence, uh, was the linchpin, uh, to proving his intent and knowledge, uh, significantly oversells the value of this piece of evidence. Uh, and in the government's closing argument and rebuttal, uh, that's the point the government, uh, brought home to the, uh, jury. And in Ms. Carmichael's closing, uh, she also had, uh, uh, took extensive opportunity to knock down this document and to say, there's no indication that, uh, Mr. Zhu sent this. We don't know what was said. We don't know anything, uh, that Mr. Zhu ever said to Dr. Hui. So I'm, uh, the, the two-part answer to your question, Judge Diaz, is that there was significant evidence of Mr. Zhu's knowledge and intent, uh, other than this document. And to the extent that, uh, this document was damning, uh, Ms. Carmichael very effectively, uh, uh, had her opportunity in closing argument to rebut it, uh, put it in context and diminish its importance, uh, given that there's, uh, the record doesn't contain, uh, any affirmative statements by Mr. Zhu, uh, uh, supporting what's in the email. Did you argue to the jury that the offense was complete when he agreed to be fingerprinted? Yes. I believe, uh, that's the last line of the rebuttal. I don't want to, uh, to tie myself to that, but I believe that's how the government sat down on the case. I assume that my time is up. Thank you, Your Honors. We ask that the, uh, conviction be confirmed. Thank you. Ms. Carmichael. Thank you, Your Honors. First, I just wanted to dispel with the notion that, uh, Mr. Zhu fled in this case. The record absolutely contains no evidence that Mr. Zhu knew about the warrant out for his arrest. The evidence was that Mr. Zhu moves around a lot, um, and the evidence also showed that he was in a room with a dangerous man, um, and could have very easily packed up his bags and, and, and left for that reason. So, um, just as an initial premise, I wanted to dispel with that notion. Um, but I also wanted to point out for the court that this, um, should the court rule in the defendant's favor, this is a very small universe of people, um, that we're talking about who would have a material exculpatory witness who's deported. Um, and that's seen just on a micro level with this case. Um, the government has pointed out that there were 24 defendants in this case, and that I think, um, close to 20 of them pled guilty. Um, and undoubtedly, uh, Dr. Hui may have been able to provide some level of favorability to those other defendants. However, all of those other defendants, and probably the reasons why they pled guilty was because they engaged in the follow-up action after the meeting. Um, they either went back to pick up their green card, or they provided money, or they mailed documents or something. And that's what we do not have in this case, which is why the exculpability level of Dr. Hui's statement is so high and so unique to this particular defendant. Um, and even in just the, the case law itself, um, your honors can see that there's not a wide, um, range of cases that deal with this issue, much less ones that have been ruled favorably for the defense. So I think it is a very small universe of people that we're talking about where you don't have to speculate as to what their statement is, and it goes directly to, um, the heart of the defense at issue. Again, sorry, just the timing, at the time that, um, the witness was deported, the government didn't know what your client's defense was going to be. That's correct, your honor. But the government did know that my client never took any follow-up action after that, um, hotel meeting. I had no idea that the, I mean, it's a little tricky, right, for the government to have to try to figure out, well, I've got this witness, he maybe said this thing, or if he also said it to this guy, who we can't find for whatever reason, maybe, if that guy's defense turns out to be lack of intent, that would be relevant. I certainly understand your point, Judge Harrison, I'm not, um, trying to suggest that the government actually come up with defense theories, but I think that, um, when, when you have a witness say, well, I actually told my customers that this was legal, I think that unquestionably is going to be an exculpatory statement, no matter what the defense is or not, and therefore the government should have afforded, um, counsel opportunity to interview that witness for further exculpatory information. Certainly the government itself isn't going to attempt to elicit, um . . . Is it a denial of compulsory process to not, um, I mean, that's the core claim, right? And so, the idea, it's just hard for me conceptually, the idea is that no one asked for compulsory process, but still it was impermissibly denied. Do you know what I'm saying? I, I don't exactly, your honor. There was no lawyer in the room saying, I'd like to talk to this witness, and then the witness is deported. Correct, your honor. So, so the request for compulsory process comes 18 months after the person is gone, can't be served. That's correct, your honor. So it's hard to think of it, right? It's sort of, it's more like the government has an affirmative obligation. This isn't, government didn't deny compulsory process. Your point is more the government had an affirmative obligation to make sure that compulsory process would be available. Absolutely, your honor. Absolutely. And that goes directly . . . Are there cases that do that? Um, yes, your honor. There were cases cited in both parties' briefs where the government actually, um, uh, asked permission from the court to release a potential witness, um, or a witness that had potentially exculpatory information and could have done so in this case. Um, your honor, that goes to the, um, bad faith requirement that the government, um, discussed. And I just wanted to clarify one thing. First of all, in this circuit, the bad faith requirement has not been, um, has not been established. And in Musawi, um, which is the case that mainly discussed that, uh, the balancing that the government alleges is solely a determination of materiality and favorability, not bad faith. Um, additionally, I believe that the district court's, uh, um, evaluation of bad faith was not the appropriate evaluation, um, when it, it, it alleged that there was no, um, scintilla of evidence showing bad faith. There's no official animus here, uh, your honors, and, and we're not alleging that. Um, but the test in the 6th, 9th, and 10th circuits says that the bad faith requirement is simply the knowledge that the government has, uh, that the witness has exculpatory information and the government deporting it anyway. Um, and finally, your honor, I'd just like to say that, um, the translation requirement doesn't just extend to confessions. It is, um, in Chivin, United States v. Chivin, uh, this court has said that, uh, it does go to just testimony. And if the government wanted Dr. Hui's email in evidence, the government didn't have to deport Dr. Hui. Carmichael, before you sit down, do you agree with the government that this offense was complete when your client showed up at that, that meeting? I think that's what they said. Absolutely not, your honor. This offense never occurred in that hotel room because my client gave his fingerprints, uh, not with the intent to defraud the government, but to engage in the path, path of least resistance and get out. All right. Thank you. All right, we'll come down and re-counsel and then go on to our next case, Ms. Carmichael. I note that you're court-appointed. We appreciate very much your undertaking representation of this client.
judges: William B. Traxler Jr., Albert Diaz, Pamela A. Harris